[PHILADELPHIA, January, 10, 1831.]

## BORREKINS against BEVAN and PORTER.

### IN ERROR.

3 R    23
22 SC  ¹480

3r     23
37SC  ³591
f38SC ¹613

In all sales of goods there is an implied warranty, that the article delivered shall correspond in specie with the commodity sold, unless there are facts and circumstances to show that the purchaser took upon himself the risk of determining not only the quality of the article, but the kind he purchased.

Therefore if the defendant sell, and the plaintiff purchase an article as *blue paint*, and it is so described in the bill of parcels, this amounts to a warranty, that the article delivered shall be *blue paint*, and not a *different article.*

In order to sustain an action on an implied warranty in a contract for the sale of goods, it is not necessary that the plaintiff should, before bringing suit, redeliver or tender the the article to the defendant.

THIS was a writ of error to the District Court for the city and county of *Philadelphia* in a suit brought by the plaintiff in error, *Henry P. Borrekins* against the defendants in error, *Mathew L. Bevan* and *William Porter*, trading under the firm of *Bevan* and *Porter*, to recover damages on an implied warranty in the sale of an article as *blue paint.*

On the trial of the cause before Judge HALLOWELL in the court below, on the 11st of *October*, 1826, it appeared in evidence, that the defendants, on or about the 1st *May*, 1820, sold to the plaintiff four casks of paints, and rendered to him a bill of parcels, of which the following is a copy, viz.—

*Mr. H. P. Borrekins,*                        *Philad. May,* 1, 1820.
                        Bought of *Bevan* and *Porter,*

4 casks paint, viz.

| | | | | |
|---|---|---|---|---|
| 1 cask blue, | wt. | 5. 0. 23 | | |
| | tare, | 2. | | |
| | | 4. 2. 23, is 527 lbs a 50 cts. - - | 263,50 | |
| 1 do. green, | " | 3. 2. 4 | | |
| | tare, | 2. | | |
| | | 3. 0. 4  is 340 lbs. a 25 cts. - - | 85,— | |
| 1 do. do. | " | 5. 3. 3 | | |
| | tare, | 2. | | |
| | | 5. 1. 3  is 591 lbs. a 12½ cts. - - | 73,87 | |
| 1 do. yellow, | " | 6. 1. 19, | | |
| | tare, | 2. | | |
| | | 5. 3. 19, is 663 lbs. a 1-100  - - | 6,63 | |

Credit, 4, 6, and 8 months,                    Dollars    429,

(Borrekins *v.* Bevan and Porter.)

The plaintiff, thereupon, gave to the defendants his three promissory notes for the price payable in four, six, and eight months, which, were paid as they respectively became due.

The plaintiff examined as a witness on his behalf, *Isaac W. Blanchard*, who testified as follows : " I was not present at the purchase by *Mr. Borrekins*. I believe it was made at the defendants' counting-house. The articles described in the bill of parcels were bought and carried to the manufactory.  Some time, very near a twelvemonth afterwards, *Mr. Borrekins* brought a sample of this stuff (pointing to the specimen presented to him by the plaintiff's counsel,) and directed me to go down to *Messrs. Bevan* and *Porter*. It was about *March* or *April*, I went, and I stated to *Mr. Bevan*, that *Mr. Borrekins* claimed the money paid because that article was not according to sample ; I exhibited a sample to the defendants, and told *Mr. Bevan*, that that was a sample of the blue, which  *Borrekins* had purchased of him.  *Mr. Bevan* took a little in his hand, and said, ' this is not blue : it does not look as if it even had been blue.'  He then stated, that there would be no difficulty about settling it : that *Mr. Humphreys* was not then in the city, but was expected shortly, and that then there was no doubt the matter would be adjusted amicably.  *Mr. Borrekins* brought the sample, and showed it to me.  I know that the cask remains there yet at the manufactory.  My business did not lead to the manufactory ; it led to the store."  On his cross-examination the witness said, " The sample *Borrekins* showed me  at the time of  making the purchase was verditer blue."

*George  Wood*, another witness called by  the plaintiff, testified thus : " This article (pointing to  the specimen  exhibited to the preceding witness,) was sent to me, and I received it as foreman of *Mr. Borrekins'* factory.  I received it at the latter end of 1820, as near as I can recollect.  I received it with a cask of green ; nothing else that I recollect.  I do not know what that article (pointing as before,) is.  It is not paint.  I recollect only receiving the two casks, one blue, the other green.  I saw a sample of this before I received the paint.  The sample was a good article.  It was sent for me to try if it was good.  The sample was sent by *Mr. Borrekins*.  I have tried this since.  I could not do any thing with it.  I judged of the sample by the looks ; it looked very well ; it did not look like this. I opened the cask myself.  This is a fair sample of what the cask contains.  I opened the cask about six or eight weeks after I received it."  Being cross-examined, he said, " It ran generally through the cask like this. The sample which I saw, had all the appearance of being good verditer.  This blue paint does not injure by keeping."

*James Kearney*, being then called as a witness for the plaintiff, swore as follows : " I was at that time a workman in *Borrekins'* factory.  The cask of paint was received about the latter end of 1820. We tried it ; I cannot tell when, perhaps six or eight weeks after we received the cask.  I rather think a cask of green was received at the same time.  I cannot recollect whether any others about the same time.  We had not received any other cask of blue for some

time before, as I recollect. I do not recollect the purchase of any other cask of blue by *Mr. Borrekins,* at any time." On his cross-examination he said, " We used blue paint in the factory : we generally made the blue paint."

*Isaac W. Blanchard,* being again called, said : " *Mr. Borrekins* used exclusively *Prussian* blue. He made all he used. *Mr. Borrekins* did not purchase any blue paint excepting this, while he was in business. The verditer blue which this is, is a different article from the *Prussian.* This is the only cask of such stuff in our factory. An account of stock has been taken every year, and this is the identical cask." On his cross-examination the witness said : " *Borrekins* never used verditer blue in his factory. It was a very scarce article. He used the *Prussian* blue. He could not obtain the verditer of a quality sufficiently good. Some verditer will not work in water, but will in oil. I do not recollect making trial of the verditer. The other witnesses are mistaken as to its being the latter end of the year."

*Henry Troth,* another witness examined on the part of the plaintiff, said : " I have been accustomed to deal in paints, and verditer among the rest. I am something of a judge. This (pointing to the specimen before referred to,) might be called blue paint, but it does not resemble any paint we sell under that name. This is a mixture of some blue paint with a part dirt, different from any thing we are accustomed to deal in. I think there is inferior blue verditer among it mixed in with dirt. I should not consider this any paint : verditer is not called a high priced paint. Fifty cents is about a fair price. That used to be the price about six years ago. My impression is that was a fair price. It is not apt to injure by keeping. I never saw or heard that it was."

The defendants then offered in evidence a book of original entries made by their clerk at the time, for the purpose of showing that the sale was made in the first instance of three kegs of paint at certain prices, and that afterwards four kegs were included in the sale, and the price of one of them greatly reduced. An objection was made by the counsel for the plaintiff, to the admission of the book in evidence for the purpose for which it was offered, but the Judge overruled the objection, and an exception was taken to his opinion.

The defendants then called and examined as a witness *May Humphreys,* whose testimony was as follows : " I have no interest in this question. This blue paint was originally *Junius Smith's* of *London,* and was sent out to *Adams* and *Swift* of *Baltimore.* After the failure of *Adams* and *Swift,* it came into my hands as agent. I was ignorant of the value of paints. I brought samples to *Philadelphia,* and with *Mr. Bevan,* exhibited them to *Mr. Borrekins. Mr. Borrekins* declined coming to any arrangement at that time ; but enough passed between us to induce me to send them to this market. On my return to *Baltimore,* I sent the paints to *Bevan* and *Porter* to be subject to a re-examination. There were one or two more that samples had been ex-

hibited of. The cask of green was sold at a reduction of fifty per cent. from what I had originally stated. *Bevan* and *Porter* settled with me and paid me the proceeds after they became due. They paid me many months before I heard of any objection being made to them. I was not present at the final sale. The first was indefinite, but was to become absolute, if on delivery, the articles corresponded with the samples. I accounted with my principal before I had knowledge of any objection. I accounted to *Adams* and *Swift*, in the settlement of an account with them. I think it was a twelvemonth after the sale, before I heard of any objection."

When the evidence was closed, his Honour charged the Jury, " that the law was, that the plaintiff could not recover, unless an express warranty or fraud were proved : that a description in a bill of parcels of an article sold as *blue paint*, does not amount to a warranty that it is so ; and that in order to support his action, it is incumbent on the plaintiff to show, that before bringing suit, he tendered or redelivered the article to the defendants."

To this charge the counsel for the plaintiff tendered a bill of exceptions, which was sealed by the Judge.

In this court the following errors were assigned, viz :—

1. That the court below erred in permitting the defendants to give in evidence a book of original entries made by their clerk, for the purpose of showing the time and circumstances of a certain sale made by them to the plaintiff, and the quantity sold, and the price agreed upon therefor ; and for the purpose of showing also, that the quantity sold was afterwards increased, and the price thereof reduced.

2. That the court erred in charging the Jury, that the plaintiff could not recover unless express warranty or fraud were proved.

3. That the court erred in charging the Jury, that the description in the bill of parcels of the article sold, as *blue paint*, does not amount to a warranty that it is so.

4. That the court erred in charging the Jury, that in order to support his action, it was incumbent on the plaintiff to show, that before bringing suit, he tendered or redelivered the article to the defendants.

*J. M. Read* and *Kane* for the plaintiff in error. 1. The book of the defendants was not competent evidence, and ought not to have been admitted. The plaintiff had proved the contract of sale by exhibiting the bill of parcels rendered by the defendants, and assented to by the plaintiff, who had given his notes in accordance with it, and paid them at maturity. The defendants then offered their book of original entries to prove the nature and circumstances of the transaction, the time when the negociation originated, and the modifications it underwent, before the contract was finally adjusted. Books are not evidence for purposes of this kind. They are evidence to prove the sale and delivery of goods, and the performance of work, but not to prove the negociation, which led to the sale, or any other matter

merely incidental or collateral.　The necessity which gave rise to the admission of evidence of this description, in the limited transactions of early times, when few clerks were kept, cannot be considered as applicable to the transactions of a great commercial house, whose numerous clerks and assistants enable them to produce witnesses to any matter connected with its business, which it may be necessary to prove.　The policy of our courts has latterly been, to circumscribe, rather than enlarge the limits of the rule.　There is no reason why the books of one party to a contract should be evidence more than those of another.　There is certainly no reason why, when the *tradesman's* habits of business are dropt, and the necessity for such evidence has ceased, the *merchant* should have the privilege, given by necessity to the small shop-keeper.　Large sales are now more frequently made at the counting-room of the purchaser, than at the warehouse of the seller, and the true co-temporaneous record of the transaction, would be the books of the purchaser; yet they are never admitted.　A sale differs from a barter only in the consideration, it being merchandize in the one case, and in the other money; yet courts do not permit cash paid to be proved by the books of the party. The reason is, that the custom was not extended so far in early times, and policy forbids an enlargement of its ancient boundaries.　The uniform effort of our courts for a long time past has been to multiply exceptions to a rule which is itself an exception to the general principles of evidence. *Baisch* v. *Hoff*, 1 *Yeates*, 198.　*Poultney* v. *Ross*, 1 *Dallas*, 238.　*Sterrett* v. *Bull*, 1 *Binn*. 234.　*Cooper* v. *Morrel*, 4 *Yeates*, 341. *Rogers* v. *Old*, 5 *Serg. & Rawle*, 409. *Smith* v. *Lane*, 12 *Serg. & Rawle*, 80. The principle on which these cases have gone is, that wherever by the custom of trade, or the circumstances of the particular case, it appears that better evidence can be procured, books are not admitted.　Thus, where there is a collateral undertaking, it is usual to make it in writing; where money is paid, a receipt is given; where goods are received for sale on commission, they are, by the usage of merchants, accompanied by instructions; where invoices have been copied, they can be produced; where receipts are by custom signed on the delivery of goods, the original receipts can be produced; and, as in this case, where a bill of parcels is rendered, that can be exhibited; in all these and similar cases, books are inadmissible.　The admission of the books of the defendants in the present case, was calculated to lead to error and confusion.　They exhibited two transactions, one on the 6th *April,* the other on the 11th *May.*　One or the other was not in question, and consequently the entry relating to it, could not properly be evidence.　The first was in fact not a sale, but a mere inchoate bargain as is proved by *Humphreys*, and was recorded, like the transaction in *Rogers* v. *Old*, as part of the pending business of the defendants, but not intended to charge the plaintiff.　It was of course not evidence.

Another fatal objection to the admissibility of the books is, that the contract had been defined and fixed by the bill of parcels.　It was

(Borrekins *v.* Bevan and Porter.)

the defendants' own written exposition of the contract, and cannot now be varied, controverted, or explained away by the uncommunicated memoranda to be found in their private books. *Vandevoort* v. *Smith*, 2 *Caines*, 161. *Mumford* v. *M'Pherson*, 1 *John. Rep.* 418. *Dean* v. *Mason*, 4 *Day*, 428. *Osgood* v. *Lewis*, 2 *Harris & Gill*, 522. *Yates* v. *Pym*, 6 *Taunt.* 446. If then the evidence of witnesses cannot be received to vary a contract thus reduced to writing, still less can a secret record made by the party himself, for his own purposes, be adduced, to prove negociations, which are merged in the bill of parcels, or that the contract was different from his own exposition of it, communicated to and accepted by the opposite party. There is a distinction between a bill of parcels and an invoice. The invoice, as was said in *Jones* v. *Bright*, 5 *Bing.* 533, is frequently not sent till long after the contract is completed, and in such cases, " whatever was not matter of previous discussion, but formed part of the contract, may be given in evidence." The bill of parcels, on the other hand, is the co-temporaneous evidence of the contract. In the case before the court, it is dated on the very day of the contract, and ten days before the entry in the book, offered in evidence.

2. and 3. No fraud is imputed to any of the parties, who participated in the sale of the article in question, but it is insisted, the plaintiff is entitled to recover, because he had what amounted to a warranty, first, in the sample, and secondly, in the bill of parcels, the general principle being, that a sample, or a description in a sale note, advertisement, bill of parcels or invoice, is equivalent to an express warranty, not of the *quality* of the goods, but that they are of the *kind* they are represented to be. This is a question, which, however well settled by the usage and understanding of merchants, has never been judicially decided. *Jackson* v. *Wetherill*, 7 *Serg. & Rawle*, 480, which was relied upon by the Judge of the District Court does not touch it. That was a question of warranty as to quality ; as to the habits of a horse, and the decision of the court was nothing more, than that certain expressions used by the seller, were merely declarations of his opinion, and not a warranty of the qualities of the animal sold. *Curcier* v. *Pennock*, 14 *Serg. & Rawle*, 51, was not the case of a described article, bargained for by a fixed name, but of an article exhibited to the buyer. It was called " *Cayenne* money," on the plaintiff's books, but its genuineness had been throughout matter of question, and had been the subject of separate enquiry by the receiver, who took it on speculation, at his own risk. It was decided on the particular circumstances of the case, and no question was raised as to the article delivered, being the same in kind as that contracted for. The *Pennsylvania* cases then, it is clear, do not sustain the opinion of the court below. In admitting that the question is *res integra* here, all is admitted that can be asked on the opposite side. It can be solved only by reference to the laws of other countries, whose interests are analogous to our own, and by an enquiry into the policy of those laws. In *France*, and wherever the civil law pre-

(Borrekins *v.* Bevan and Porter.)

vails, that is, throughout the commercial portion of the continent of *Europe*, the law is what the plaintiff now contends for. *Pothier de Vente*, sec. 202. p. 121. The seller is bound by the very nature of the contract of sale, to guarranty, that the thing sold is free from such defects as would render it useless or injurious for the purpose for which it is sold; and without any other warranty than that which is implied in the very nature of the contract, the buyer has his action for redress. *Civil Code Nap.* Art. 1640, 1641. The law of implied warranty, it is true, does not apply to patent defects, against which, by the common law, even an express warranty, affords no protection. 3 *Bl. Com.* 165. In *England* at a very early day, the rule which governed real property, was applied to the transactions of commerce. At first little injury resulted from this circumstance, because trade was very limited in amount, and generally conducted in market overt, and there were few articles which could not be judged of by inspection at the Chapman's Stall. In the year 1600, or thereabouts, the case of *Chandelor* v. *Lopus, Cro. Jac.* 4, was decided on this principle. But as commerce increased, the rule was found intolerable; for commerce cannot exist without confidence, which can be secured only by compelling every contracting party to do that which at the time of contracting, he professed his intention to do. A multitude of more recent decisions in *England*, have placed the doctrine on a footing more in accordance with the necessities of the extended commerce of that country, and the laws of other commercial states. *Hibbert* v. *Shee*, 1 *Camp.* 113. *Laing* v. *Fidgeon*, 2 *Taunt.* 108. 1 *Eng. Com. Law Rep.* 327. *Parker* v. *Palmer*, 4 *Barn. & Ald.* 387. 6 *Eng. Com. Law Rep.* 456. *Bridge* v. *Wain*, 1 *Stark.* 504. 2 *Eng. Com. Law Rep.* 486. *Rowe* v. *Osborne*, 1 *Stark.* 140. 2 *Eng. Com. Law Rep.* 329. *Yates* v. *Pym*, 6 *Taunt.* 446. 1 *Eng. Com. Law Rep.* 446. *Gardener* v. *Gray*, 4 *Camp.* 144. *Bosser* v. *Hooper*, 1 *Moore*, 106. *Jones* v. *Boaden*, 4 *Taunt.* 853. *Dye* v. *Fynmore*, 3 *Camp.* 162. *Peake's Ev.* 228. 3 *T. R.* 57. *Shepherd* v. *Kain*, 5 *Barn. & Ald.* 240. 7 *Eng. Com. Law Rep.* 82. *Hern* v. *Nichols*, 1 *Salk.* 289. *Paley on Agency*, 229. *Fortune* v. *Lingham*, 2 *Campb.* 416. *Gray* v. *Coxe*, 10 *Eng. Com. Law Rep.* 283. *Jones* v. *Bright*, 5 *Bing.* 533. 15 *Eng. Com. Law Rep.* 529. *Salmon* v. *Ward*, 12 *Eng. Com. Law Rep.* 95. The more recent decisions in *New York*, *Massachusetts*, and *Maryland*, and the other commercial states of the Union, are in harmony with the principles of the modern *English* cases. *Bradford* v. *Manly*, 13 *Mass. Rep.* 145. *Sands* v. *Taylor*, 5 *Johns. Rep.* 395. 404. *Willing* v. *Consequa*, 1 *Peters*, 317. *Swett* v. *Colgate*, 20 *Johns. Rep.* 196. *Oneida Company* v. *Lawrence*, 4 *Cowd.* 440. *Andrews* v. *Neelin*, 6 *Cowd.* 354. 357. *Hastings* v. *Levering*, 2 *Pick.* 214. *Conner* v. *Henderson*, 15 *Mass. Rep.* 319. *Henderson* v. *Sevey*, 2 *Greenl.* 139. *Chapman* v. *March*, 19 *John. Rep.* 290. *Roberts* v. *Morgan*, 2 *Cowd.* 438. *Higgins* v. *Livermore*, 14 *Mass. Rep.* 106. *Hastings* v. *Lovering*, 2 *Pick.* 214. *Lewis* v. *Thacher*, 15 *Mass. Rep.* 431. *Osgood* v. *Lewis*, 2 *Harris & Gill.* 495. 518. *Williams* v. *Spafford*, 8 *Pick.* 250. The question,

therefore, for the determination of this court is, whether the law of *Pennsylvania* on the subject of implied warranty, shall correspond with that of *France, England*, and the commercial states of this country, as it exists at the present day, or whether it shall be a transcript of the law as introduced into *England* some centuries ago, which has been repealed, and repudiated in favour of the commercial necessities of that country.

As to the policy of the rule now contended for by the plaintiff, it is impossible to entertain a doubt, for no one can deny that a man should so execute his contract as to comply with the just expectations of the other contracting party, and with his own declared intentions. If a man purchase tea from a *China* merchant, and having sold it to a Western trader, it turns out that the box contains chaff, he is bound by the unvarying usage of trade, in such cases, to refund the price. Even the law of *China* gives redress. If one purchase plate of a silversmith, and on using it, it is discovered that the metal is base, the seller must return the money, and even ignorance of the fraud will not excuse him. So if one purchase a box of bullion, a bale of cotton, or a cask of paints, and it turns out, that the box contained pewter instead of bullion, the bale, stones or rubbish, instead of cotton, or the cask, dirt instead of paint, it cannot be law, that the party aggrieved is without redress; yet such is the result to which the doctrine of the court below must necessarily lead. If there is no redress without express warranty or fraud, there is no redress at all. As to fraud, the essential element of it is the *scienter*, and how can that be proved? How can the purchaser show that the seller was a better judge of the article than himself? If he sold bullion, he was perhaps, no more of an alchemist than the buyer. If cotton, he probably never unpacked the bale, and knew nothing of its contents further than had been represented to him. The rule by which justice would be done to all, is that which gives a remedy to the buyer against the party from whom he immediately purchased, and refers him to the party from whom he had the article, and so on until the party guilty of the fraud is reached. Then, as to warranty; men ask warranty of quality, but never of kind or character. In buying a horse, the purchaser asks warranty of soundness, because though blind or lame, the animal is still a horse. So in buying a ship, a warranty of seaworthiness is asked for, because though rotten in every timber, the vessel is nevertheless a ship; but who asks for a warranty, that a horse is really a horse, or a ship a ship? Fraud, in cases like the present, can easily be proved if it exist, and often has no existence between the immediate parties; and such a thing as an express warranty, that the article described in the contract of sale, or the bill of parcels defining the contract, and the article really sold, are the same, was probably never heard of. To affirm the judgment of the court below is, therefore, equivalent to a decision, that in no case, can a party aggrieved in a contract of sale like that now under consideration, obtain redress in a court of justice.

(Borrekins *v.* Bevan and Porter.)

4. The error in the charge of the court below, that it was incumbent on the plaintiff to show, that before bringing suit, he tendered or redelivered the article to the defendants, arose from confounding two remedies, which were within the plaintiff's reach, and between which he made his election. Where the consideration of a contract has been executed, and there is a failure to complete the performance, the party aggrieved may either rescind the contract, and recover back the consideration, or admit the contract, and recover damages for a breach of it. The consideration may be recovered back, by a special action on the case, or by an action for money had and received. To sustain either of these actions, with such an object, the plaintiff must show, that he has paid the consideration, and that by recovering it back, the defendant will not be placed in a worse situation than he was before the contract, which the plaintiff cannot rescind to the prejudice of the defendant. He must, therefore, show, that before bringing suit, he re-delivered or re-paid what he received from the defendant, and has thus restored him to his former situation. But it is not always in the power of the party aggrieved, to rescind the contract, and recover back the consideration. The goods may have been shipped, or worked up, before the injury is ascertained, and the return of the goods then becomes impossible. In such a case, the remedy is by a special action on the contract, alleging a breach, and demanding damages for it. In adopting this form of action, the plaintiff avoids the necessity of showing a re-delivery. These remedies accord with those of the civil law, from which most of our commercial principles are derived. Where the article sold differs in character from that described, the purchaser, by that law, has two remedies, 1st. *Actio redhibitoria*, in which he returns the article, and recovers back the price, and all expenses incurred by him, 2d. *Actio quanto minoris*, by which without a return of the article sold, the buyer obtains such a reduction of price, or a return of so much of it as is equal to the difference in value between the article described in the contract, and that delivered. *Pothier Cont. de Vente.* sec. 216. Art 4. p. 129. sec. 232. Art. 5. p. 135. The doctrine now contended for on behalf of the plaintiff, is abundantly supported by authority. Many of the cases referred to in the examination of the 2d. and 3d. errors, sustain it, to which may be added *Curtis* v. *Hannay*, 3 *Esp.* 82, 83. *Peake's Ev.* 230. *Fielder* v. *Starkin*, 1 *H. Bl.* 19. *Poulson* v. *Lattimore*, 17 *Eng. Com. Law Rep.* 373. This doctrine applies, not only to cases of express, but of implied warranty also. If it were otherwise, it would be most ruinous doctrine. Fortunately the cases take no distinction between cases of express and implied warranty. In *Steigleman* v. *Jeffries*, 1 *Serg. & Rawle*, 478, Chief Justice TILGHMAN shows the result of the *English* cases in a few words, and explains how it is, that some of them at the first glance, wear an appearance at variance with the principle, which upon closer examination, they do not affect. The opposite doctrine would lead to the worst results, and in many cases operate as a bounty to fraud. If when

(Borrekins *v.* Bevan and Porter.)

a man has paid his money for a horse, which he contracted for by
a certain description, and one of another and inferior description, is
delivered to him, he must, before he can maintain an action for the
fraud, return the animal he has received, he puts it in the power of
the jockey to injure him still further, by keeping both the money and
the horse, and thus depriving him even of the partial consideration for
which he paid his money. It is making the operation of a legal right
a species of gaming, to require, that before a man shall have a chance
of recovering back, what he has been cheated of, he shall stake what
he has received against the black legs.

*Chauncey* for the defendants in error.—This is one of the many
cases in which by confining the attention to the exact matter of ex-
ception, injustice is done to the Judge and to the cause. To under-
stand the charge, it is necessary, first to understand the case, and see
what the facts were on which the charge was founded. This result
will not be reached, by taking an abstract position in the charge, and
making that, by itself, the subject of exception. The evidence is
brought up for the purpose of elucidating the charge, and should be
used for that purpose. A proposition may be stated by a judge,
which in the abstract may be questionable, but which, taken in con-
nection with other matter, may be correct. If taken in connection
with the evidence, the charge of the judge in this case, will be found
free from error. The sale was made in May 1820, and no complaint
was made for nearly a year, and no suit was brought for nearly two
years after. On the trial, the plaintiff endeavoured in the first place
to prove a sale by sample, in which the evidence did not sustain him.
The Judge charged, that a sale by sample implies a warranty, and
left to the Jury the fact, whether or not the sale was by sample; stat-
ing his own impressions that it was not. It is not now matter of ex-
ception that the Judge did not leave this to the jury, nor could it be,
for he did. It must therefore be considered that the jury found that
it was not a sale by sample. *Brown on Sales*, 338. *Meyer* v. *Everth*,
4 *Campb.* 22. The plaintiff, in the second place, endeavoured to es-
tablish that the description in the bill of parcels, was a warranty that
the article sold corresponded in character and quality, with the de-
scription. The Judge referred to the consideration of the jury, whe-
ther the plaintiff examined the article, and stated it to be clear that
he did so, or had the opportunity of doing so. Under these circum-
stances he charged that this bill of parcels, evidently made after the
purchase, was no more than a description, not a warranty, as in *Jack-
son* v. *Wetherill*, 7 *Serg. & Rawle*, 480. The case then stood
thus. It was for the jury to decide whether it was a sale by sam-
ple. If it was, it was a case of warranty, and then the jury were
to consider whether the bulk corresponded with the sample. If it
was not a sale by sample, was it a case of warranty, by means of the
bill of parcels? Under the circumstances the Judge thought it was
not, and the plaintiff did not declare upon it as such. The bill of
parcels was not the contract, but a mere description. The purchaser

bought either upon examination, or with opportunity to examine, and the bill of parcels was made and rendered after the sale.　It is upon this state of things the Judge must be considered as having charged, that if there was neither warranty nor fraud, the plaintiff was not entitled to recover.　In this he was right,

*First.* Because this was not a sale by sample, and must be taken to have been so found by the jury.　If it was such a sale, the charge was in favor of the plaintiff.

*Second.* It was a sale of a commodity in the usual course of business, where the purchaser had abundant opportunity to examine, and where it must be presumed he did examine the article, and the purchase was made on that examination, and not on any warranty express or implied.

*Third.* It was a sale on credit, made by agents, and the payments were made by the purchaser at four, six and eight months, without objection, and the agent has accounted with and paid over to his principal.

*Fourth.* It was not a sale upon warranty, and the purchaser, if he objected to the article, and was entitled to object, was bound to return or offer to return the article.

*First.* It is unnecessary to spend a moment in the examination of the cases cited to shew that a sale by sample carries with it an implied warranty.　The principle contended for was not denied by the Judge, nor is it now.

*Second.* Under the circumstances of this case, in the absence of fraud and warranty, neither of which is alleged, the purchaser stands nakedly on his own judgment of the article, and if he misses in that, he has no redress.　The case is a fair one, to present the rule of law which is well settled, and is clear of the various exceptions which have been made to the rule.　No rule can be more salutary or reasonable than that which the judge applied to this case.　The seller and buyer were equally ignorant of the quality of the article, of its distinctive features and character.　It was an article brought from a far country, paid for by the seller under the same description, and sold with a full belief it was the article he undertook to sell.　The buyer made the purchase under the same impression.　It turns out to be of inferior quality, adulterated, and that a fraud has been practiced abroad.　Reason and common convenience would say, that the seller and purchaser being on equal terms, the maxim *caveat emptor* must govern the case.　It seems to be agreed, that if there be neither warranty nor fraud, the seller is not responsible for mere inferiority of quality, but it is contended he is bound to give a merchantable article of the kind and character he undertook to sell.　There is no reason, however, for a distinction between the cases, where the purchaser has an opportunity to examine the article.　If the article turns out to be of inferior quality, it is conceded, that the seller is not answerable, because the buyer purchased on his own judgment, and asked no warranty.　The same reasoning applies with equal

(Borrekins *v.* Bevan and Porter.)

force to the case of admixture, of adulteration of different substances in whole or in part. Admixture, particularly such as occurred in this case, of blue paint and dirt, is as easily detected, perhaps more. so, than mere inferiority of quality. If the purchaser avails himself of the opportunity of examination, or buys as if he had examined, where is the reason for a difference between this case and that of mere inferiority of quality? If the rule be adopted at all, it must be throughout. But the rule of the Roman law, that sound price calls for sound goods, is not the rule by which we are governed. The common law is our law. The rule of reason and that which is sanctioned by the best authority is, that when a sale is made of an article in the usual course of business, and a full opportunity is given to the purchaser for examination, and there is neither warranty nor fraud by the seller, the buyer cannot resort to the seller, on the ground of inferiority of quality, of adulteration, of admixture, or of any difference in the article. There are some cases, decided in later times, which either do not come within the rule, or may be considered as exceptions to it. One of these is, the purchase of a manufactured article from the manufacturer, who is considered as warranting that the article he sells or makes for the purchaser, is of a fair merchantable quality. Such were the cases of *Laing* v. *Fidgeon,* and *Jones* v. *Bright.* Another of these cases is that of a sale of articles not usually the subject of examination, or which cannot be examined. Thus if a wine merchant undertakes to sell Madiera, and sends Teneriffe, or if an apothecary professes to sell magnesia and delivers cream of tartar, the purchaser is not bound. There may be cases too, ruled by the custom of trade, with regard to which the court should be very cautious. Perhaps another case may be that of a sale of an article for a foreign market, or for a specific purpose, as in the case of *Gray* v. *Coxe.* The present case may be considered one of mere inferiority of quality, which arises from various causes, of which it is sometimes very difficult to judge. Mr. *Troth,* the most skilful man examined, says the article might be blue paint, but *did not* resemble any paint he sold under that name; it was a mixture of inferior blue paint and dirt. An examination of the books will shew, that the rule now proposed on behalf of the defendants in error, has the support not only of good sense, but of authority, although a case may now and then occur, or a sentiment be expressed by a judge, wearing a different aspect. (Mr. *Chauncey* here examined and explained a number of the cases cited by the counsel for the plaintiff in error, for the purpose of shewing that they sustained the principles for which he contended. He also referred to *Parkinson* v. *Lee,* 2 *East,* 314, 2 *Kent's Com.* 274, 275. *Wilson* v. *Shackleford,* 4 *Rand. R.* 5.) The rule which may be fairly deduced from the cases, is that for which the defendants in error now contend, and which was applied by the court below to the present case. The plaintiff did not declare upon a warranty, nor was there any evidence that a warranty was expected, or intended to be given, but the contrary. The sale

(Borrekiñs *v.* Bevan and Porter.)

was made on inspection actually had, or opportunity offered for it. The bill of parcels was given afterwards. In such a case it can be regarded as no more than a mere description of the thing sold, not even amounting to an affirmation that it really was what it was described to be, and still less to a warranty to that effect. Cases of a description before the sale, by advertisement, or in the contract by a sale note, bill of parcels, or invoice, may involve a warranty, but it is impossible to infer a warranty from a description given after the sale is completed. In laying down the law to the jury, the judge founded himself upon *Jackson* v. *Wetherill,* 7 *Serg. & Rawle,* 480. *Curcier* v. *Pennock,* 14 *Serg. & Rawle,* 51. *Calhoun* v. *Vecchio,* 3 *Wash. C. C. R.* 165. *Barrett* v. *Hall,* 1 *Aik. Rep.* 269. *Brown on Sales,* 409.

The position of the judge who tried the cause, that it was necessary, to enable the plaintiff to support the action, to shew that he had previously returned or tendered the article, was sound, upon the ground that there was no express warranty, in which case alone, the plaintiff is at liberty to sue upon the warranty, or defend himself by means of it, without returning or offering to return the article. The reason of this distinction between express and implied warranties, is that the former affirms and the latter annuls the contract, and no case can be found in which the party can keep the article, where his claim or his defence annuls the contract. This position is fully sustained by authority. *Brown on Sales,* 341. 475. *Fisher* v. *Lancaster,* 1 *Campb.* 190. *Groning* v. *Mendham,* 1 *Starkie,* 257. *Rowe* v. *Osborne,* 1 *Starkie,* 140. *Ritchie* v. *Summers,* 3 *Yeates,* 531. *Thornton* v. *Wynn,* 12 *Wheat.* 183. *Burton* v. *Stewart,* 3 *Wend.* 238. *Saund. on Pl. & Ev.* 303, 304. *Kimball* v. *Cunningham,* 4 *Mass. R.* 502. *Connor* v. *Henderson,* 15 *Mass. R.* 319. *Curcier* v. *Pennock,* 14 *Serg. & Rawle,* 51. *Steigleman* v. *Jeffries,* 1 *Serg. & Rawle,* 477. *Grimaldi* v. *White,* 4 *Esp. N. P. R.* 95.

Another conclusive objection to the plaintiff's recovery, was that the defendants were agents, who had accounted with their principal, and paid over the proceeds of the sale, before any objection was made. *Paley on Agency,* 37, 45.

*In reply,* the counsel for the plaintiff in error disclaimed any desire to avoid a discussion of the question under consideration, without full reference to every thing which could explain or vindicate the judgment of the court below. It would be attended with little advantage to do so, as, in case that judgment should be reversed, it would be easy for the counsel of the defendants in error to place upon the record when it came up again, all the facts and circumstances, calculated to present the question to this court, in such a manner as he deemed essential to a proper determination of the question. The declaration was drawn before it was known what evidence would be given, and certainly without any view to a contest about technicalities; and from what passed between the counsel on both sides, it was understood, that the cause was to be tried without regard to

form; that if the plaintiff could recover on any declaration, he should on that which was filed, and that if the defendants could escape on any plea, those which were put in should protect them. In the same spirit, the cause was tried.

Whether a sale is "in the usual course of business," and whether "the purchaser had a full opportunity of examining the article," are questions of fact which should have been left to the decision of the jury, for unless decided by them affirmatively, the plaintiff's right to recover would not be affected by the rule contended for on behalf of the defendants. But the court did not charge in the qualified language used by the counsel. The judge said nothing about "the usual course of business," or "opportunity to examine," but that "the plaintiff could not recover without express warranty or fraud, and that a description in a bill of parcels was not equivalent to a warranty." In this there was error even on the principles laid down on the opposite side. But these principles are themselves opposed by a host of English authorities, and to avoid their operation, the counsel introduces numerous and important exceptions, within which, however, it is impossible to bring many of the cases, with which he has to combat. If, however, the general principle be admitted to be correct, the exceptions are sufficient for the purposes of the plaintiff in error. How does it appear that paints are usually the subject of examination by the buyer? It is certainly as usual and as natural for a purchaser of wine to taste and judge for himself, as for a manufacturer of paper hangings to explore every cask of paint he buys, yet it is admitted that he to whom wine is delivered of a different character from that which he contracted for, is entitled to redress. How too does it appear that the article was not sold for a specific purpose, another of the exceptions stated by the opposite counsel? The plaintiff is among the most extensive manufacturers of paper hangings in the United States, and if the court had qualified their doctrine as the counsel now does, the intent of the purchaser might have been understood by the jury, and their verdict different. Here again the charge works an injury to the plaintiff in error. Every purchaser has some purpose in view, and ought it to be assumed, because the specific purpose is not declared, that therefore the purchaser intended to buy what had no value for any purpose? "No man," says Lord Ellenborough, in *Gardiner* v. *Gray,* 4 *Campb.* 144, "can be supposed to buy goods to lay them on a dunghill." The difficulty of distinguishing between great inferiority of quality, and entire difference in the article, is no reason for breaking down the distinction to be found in the books. To say that *trespass vi et armis* is the remedy for deceit, and *case* for consequential injuries, is to make in many cases, a most puzzling distinction. Even to say that a sane man may make a will and that an insane one may not, is to establish a principle, which in its application sometimes splits a hair. Yet these distinctions, so difficult in application, are perfectly well settled in law. But the cases already referred to expressly decide,

(Borrekins *v.* Bevan and Porter.)

that whether the purchaser had an opportunity to examine, and whether he did examine or not, make no difference as to the responsibility of the seller. If then the general principle offered by the counsel for the defendants in error be not established in its extreme bearings, and if its exceptions be not narrowed down within the limits which he has himself prescribed for them, the authorities already cited may be reverted to to shew, that in England at this time, as in France, and Europe generally, the contract of sale implies a warranty, that the article sold shall correspond in character with the article described ; and that it shall correspond in quality with the sample, if a sample has been exhibited.

The opinion of the court was delivered by

Rogers, J.—After the testimony, which is particularly set forth, in the bill of exceptions, was closed, the court charged the Jury, that the plaintiff could not recover, unless an *express warranty*, or *fraud* was proved : That a description in a bill of parcels of the article sold, as *blue paint*, does not amount to a warranty, that it is so ; and that in order to support his action, it is incumbent on the plaintiff to shew, that before bringing suit, he tendered or redelivered the article to the defendants. If the court were correct in any one of these propositions, there was an end of the plaintiff's case. The counsel for the plaintiff in error, and plaintiff below, have filed exceptions, which embrace the whole charge.

It is conceded, that with regard to the *goodness* of wares purchased, the vendor is not bound to answer, unless he expressly warrants them to be sound and good, or unless he knew them to be otherwise, and hath used any art to disguise them, or unless they turn out to be different from what he represented to the buyer. 2 *Bl. Com.* 451. The rule is as respects the *quality* of the article, *caveat emptor.*

According to the modern cases, warranties are divided into two kinds ; express warranties, where there is a direct stipulation, or something equivalent to it, and implied warranties, which are conclusions and inferences of law, from facts, which are admitted, or proved before the Jury. If the learned judge intended to say, that there can be no warranty, without an express agreement, or stipulation, or there be fraud, then his opinion is in opposition to the whole current of modern decisions. It must now be taken to be the law, (for they have conceded this in *England,* and even in *New York,* where the cases of *Chandelor* v. *Lopus,* and *Seixas* v. *Wood,* were decided,) that where property is sold by sample, there is an implied warranty, that the article corresponds with the sample, although it has at the same time been held, that it is sufficient if the bulk corresponds with the sample. This has been considered as equivalent to an express warranty and is doubtless a departure, so far, from the law as formerly understood. From a critical examination of all the cases, it may be safely ruled, that a sample, or description in a sale note, advertisement, bill of parcels, or invoice, is equivalent to an express warranty, that the goods are what they are described, or represented to be, by the vendor.

In the absence of proof, to rebut the presumption, it is of equal efficacy, to charge the vendor, as if the seller had expressly said, 1 warrant them to correspond with the description, or representation.  13 *Mass. Rep.* 139. *Bradford* v. *Manly,* 5 *John. Rep.* 395.  1 *Camp.* 113. *Hibbert* v. *Shee,* 1 *Peters,* 317. *Willings* v. *Consequa,* 1 *Eng. Com. Law Rep.* 327. 20 *John. Rep.* 196. 204. 4 *Cowen,* 440. 19 *John. Rep.* 290. 6 *Cow.* 354.  4 *Barn. & Alder.* 387.  6 *Eng. Com. Law Rep.* 456.

Without intimating an opinion how the fact may be, yet there was proof, from which the jury would have been justified in saying, that this was a sale by sample.  The paints were originally the property of *Junius Smith* of *London,* and were sent out to *Adams* and *Sift* of *Baltimore.*  After the failure of *Adams* and *Sift,* they came into the hands of Mr. *Humphreys,* a witness examined by the defendants. Mr. *Humphreys* brought samples of the paints to *Philadelphia,* and with Mr. *Bevan,* one of the defendants, exhibited the samples to the plaintiff.  Mr. *Borrekins* declined coming to any arrangement at that time, but enough passed to induce the witness to send them to the *Philadelphia* market; and accordingly on his return to *Baltimore,* he sent the paints to *Bevan* and *Porter,* to be subject to a re-examination.  The witness further states, the first arrangement was indefinite, but was to become absolute, if on delivery, the articles *corresponded* with the *samples.*

After the purchase. the paints were carried to the plaintiff's manufactory, and some time after they were delivered, Mr. *Borrekins* brought a sample of the stuff, as the witness *Isaac Blanchard* termed it, and directed him, *Blanchard,* to go down to Messrs. *Bevan* and *Porter,* and say, that he claimed the money paid, *because the article was not according to sample.*  The witness then exhibited the sample, which Mr. *Borrekins* had given him, and told Mr. *Bevan,* that was a sample of the blue, which *Borrekins* had purchased of him.  Mr. *Bevan* took a little in his hand, and said, " *This is not blue. It does not look as if it ever had been blue.*"  He then stated, there would be no difficulty about settling it; that Mr. *Humphreys* was not then in the city, but was expected shortly; and that there was no doubt, the matter would be adjusted amicably.  On this evidence it is very far from being clear, that this was not a sale by sample. It strikes me, that the evidence tends to prove that it was so sold, and moreover, that *Bevan* intended to sell, and *Borrekins* to purchase blue paint.  If the parties had not so understood it, *Bevan* would have denied, that it was a sale by sample, and would, at the same time, have asserted, that *Borrekins* took upon himself to judge of the quality and kind of the article sold. At any rate, taken in connection with the admission of Mr. *Humphreys,* the jury should have been permitted to judge, whether it was a sale by sample.  There was also some evidence, whether sufficient for the purpose, I shall not say, that the article did not correspond with the sample.  This was evidently sold as blue paint. It was the intention of the vendor to sell blue paint, as such a sample

(Borrekins *v.* Bevan and Porter.)

was exhibited by *Humphreys* to Mr. *Borrekins.* The article received, was, by the admission of *Bevan,* not blue, nor did it look, as if it ever had been blue.   *Henry Troth,* who has been accustomed to deal in paints, and verditer among the rest, says, this might be called blue paint, but it does not resemble any paint we sell under that name. This is a mixture of some blue paint with a part dirt, different from any thing we are accustomed to deal in.   He thinks, there is inferior blue verditer among it mixed in with dirt. He says, there is a variety of qualities in the market.   This would not be considered in the market, as blue verditer.   He should not consider this *as any paint.*

It is not pretended, that this was not the same article, which *Borrekins* purchased of the defendants, nor do I understand fraud to be alleged, either on the one side or the other.

It was the duty of the court to submit the facts to the jury, with the instruction, that if they believed, that this was a sale by sample, and were further of the opinion, that the bulk did not correspond with the sample, the plaintiff was entitled to recover.   It is possible, from the manner, in which this case has been removed, we may do injustice to the charge of the learned judge, yet from the record, we are compelled to say, a material question has been withdrawn from the jury, in which we concede, there is error.   The court after charging the jury, " that the plaintiff could not recover, unless an express warranty or fraud was proved, " proceed to instruct them, that a description in a bill of parcels, of the article sold as *blue paint,* does not amount to a warranty, that it is so."

·I must premise, that we do not consider the bill of parcels as the contract between the parties, but as the evidence of the contract, nor is it in *Pennsylvania,* the only evidence.   The bargain is not usually in writing, but verbal, and the bill of parcels is intended to show, that the goods were purchased, and what goods, and that they were paid for.   And in this opinion, we are supported by the cases of *Brad-. ford* v. *Manly,* 13 *Mass. Rep.* 142, and *Osgood* v. *Lewis,* 2 *Maryland Rep.* 522.

It results from this, that inasmuch as this was a verbal and not a written agreement, it is the province of the jury to ascertain what the contract was, and to declare what was the intention of the parties to it, as was decided in *Osgood* v. *Lewis,* 2 *Maryland Rep.* 526. 8 *Cowen.* 25, *Duffee* v. *Mason.*   In parol contracts the jury must determine, whether a warranty was intended.   In the case of written contracts, the court must decide whether the instrument contain an express warranty as such.

To fix the precise meaning of the judge in this part of his charge, has been attended with some difficulty.   I understand him, in effect to say, that even, if the defendants sold, and the plaintiff purchased, the article, for blue paint, it does not amount to a warranty, if on delivery, it turns to be an entirely different commodity.

It is this position, which 1 now propose to examine, and in doing so, I do not think it necessary to review all the cases, which have been

decided at *Nisi Prius* on the doctrine of implied warranty. In regard to the *English Nisi Prius Reports,* Justice BAYLEY is reported to have said, " that it is very likely one's first thoughts at *Nisi Prius* may be wrong, and he was extremely sorry, that they were ever reported, and still more so, that they are mentioned again, at least so far, as his own *Nisi Prius* decisions are concerned, because he thinks, they are entitled to very little weight. What is said by a judge upon a trial, is merely the first impression of his mind, upon a point coming suddenly before him, and which he had no opportunity of considering before hand."

My own experience, and the examination which I have given this question has not increased my veneration, for cases ruled at *Nisi Prius.* Those on warranty are numerous, and I believe, I may venture to say, cannot all be reconciled.

There is, however, a class of cases in *England,* to the authority of which I subscribe, which bear immediately on the present question. I refer to those decisions, where the goods purchased, are different in specie, from those contracted for.

The first case is *Weall* v. *King,* 12 *East,* 452, which was the case of the sale of stock sheep, and it was proved, they did not answer the description of stock sheep, that is sound lambs, but were unsound, and afflicted with the rot : under such circumstances, says Lord ELLENBOROUGH, the purchaser has a right to expect a saleable commodity, answering the description in the contract. Without any particular warranty, this is an implied term in every contract. He cannot, without a warranty insist, that it shall be of any particular quality or fineness, but the intention of both parties must be taken to be, that it shall be saleable in the market, under the denomination mentioned in the contract. *Gardener* v. *Gray,* was where silk was sold as waste silk, whereas in fact it was not so. And *Bridge* v. *Wain,* 1 *Stark. N. P. C.* 104, was the case of *Scarlet Cuttings,* which in reality were not *Scarlet Cuttings.* The case of *Shepherd* v. *Kain,* 5 *Barn. & Ald.* 240, is exceedingly strong, to the present point, where in an advertisement, of the sale of a ship, she was described as a " copper fastened vessel," but with these words subjoined, " the vessel to be taken with all faults, without allowance for any defects whatsoever." The vessel when sold was only *partially* copper fastened, and she was not what is called in the trade, a copper fastened vessel. The buyer, however, had a full opportunity of examining the vessel before the sale. But it was determined, that the buyer was entitled to damages in an action upon the warranty, and that the words, " with all faults," could only mean all faults, which a copper fastened vessel may have ; but here, the vessel was not what she was warranted to be, namely, a *copper fastened vessel.* In *Proser* v. *Hart,* 1 *Stark.* 140, it is fair to presume, that if there had been nothing existing in that case, which controlled the general rule, Chief Justice GIBBS would have ruled in accordance with these principles, that the defendant was liable, on his warranty. The Chief Justice

says, the article was sold to the plaintiffs, by the name of "saffron." They examined it with great minuteness, received it into their custody; kept it six months, and then sold part of it. Although only three fourths of it was saffron, still it was fair for the jury to infer, from the *inferior price* that was given for it, that it was such an article, as the plaintiffs intended to purchase, and under circumstances, they were justified in giving the verdict for the defendant.

We are not without authority to the same point, in some of our sister states. *Bradford* v. *Manly,* 13 *Mass. Rep.* 139, is a case of the same description. The Supreme Court of *Massachusetts* decided that a sale by sample is tantamount to a warranty, that the article sold is of the same kind as the sample. The principal object seems to be to ascertain what was the contract; whether the evidence proved a contract to sell cloves of a different kind, from those which were delivered. The objection was as here, that no action upon a warranty, can be maintained, unless the warranty is express; and that no other action can be maintained unless there is a false affirmation with respect to the quality of the article. If such were the law, says C. J. PARKER, it would very much embarass the operations of trade, which are frequently carried on to a large amount by samples of the articles bought and sold. Even in *New York,* although in 4 *John. Rep.* 421, they decided, that the mere selling an article as good at a fair price, did not amount to a warranty, and that without express warranty or fraud, the purchaser could not recover for any defect in the article; yet in 5 *John. Rep.* 404, it was determined, that a sale by sample, although no warranty that the goods are sound, and in good condition, yet is a warranty, that they are of the same kind. And in *Parkinson* v. *Lee,* 2 *East,* 314. 4 *Camp.* 22, 145, the same distinction would seem to be recognized. In *Hastings* v. *Lovering,* the Supreme Court of *Massachusetts* assert the same doctrine. That was an action on a contract of warranty in the following terms.

*Boston, April* 11*th.* 1822.

Sold to *E. F. Hastings,* two thousand gallons, prime quality winter oil, &c. at 81 cents per gallon, six months credit, deliverable within ten days, credit to commence on delivery. *William Lovering,* Junr. There was also a bill of parcels, in which the oil was called, "Prime quality winter Sperm. Oil." It was contended, as here, that these writings did not prove an express warranty. The jury found, that the oil delivered, did not answer the description; the court however, ruled, that the vendor was answerable on the warranty, and explicitly assert the principle, that a description of an article, inserted in a bill of parcels, or in a sale note, such as is used in *England,* ought to be considered evidence, that the thing sold, was agreed to be such as represented.

*Osgood* v. *Lewis,* in many respects, bears a strong analogy to *Hastings* v. *Lovering.* This was also an action on the warranty. The plaintiff, as appeared by the bill of parcels, purchased of the defendant, 115 casks of winter pressed sperm. oil. The oil was

(Borrekins *v.* Bevan and Porter.)

delivered to the plaintiff, and kept by him some time. It subsequently turned out to be not winter, but summer pressed oil, which is of an inferior quality, and of a different species. The court say, if the bill of parcels be considered as the written contract between the parties, the statement therein, that the oil was " winter pressed," could not be considered as a mere matter of description, or of an opinion, and belief of the seller ; but as the averment of a material fact, of which he has taken to himself the knowledge, and the existence of which he warrants.

In all cases where it does not correspond in kind, the purchaser has a right to say, this is not the article I contracted for, *non in haec federa veni*, and this, whether he complains at the time of delivery, or after, unless his conduct amounts to a waiver of his right to indemnity. And I venture to assert, no honest fair dealer, under such circumstances, would refuse redress. I do not look upon it as an imperfect obligation, but one in which the aggrieved has ample redress.

It is no unreasonable presumption, that every vendor is acquainted with the commodities, which he sells; I do not mean the quality, but the kind. This, however, is not always the case of a vendee. The purchaser, in numberless cases which could be mentioned, relies on the integrity and knowledge of the vendor. If a person purchase Madeira wine of a wine merchant, surely, he cannot, he cannot be a compelled to take Teneriffe, Lisbon, Sherry or Malaga; although he may have tasted it at the store, or been under the impression at the time it was delivered, that it was the kind, with which he wished to entertain his guests. So also, in the case of an apothecary, who delivers jalap, when the purchaser intended to have cream of tartar. If a person purchase of a jeweller, what both parties suppose to be diamond ring, a case of mutual mistake, which after delivery, is discovered to be glass, there would certainly be a remedy, and this could only be on the implied warranty. And this I understand to be conceded, because, says the counsel for the defendant in error, they are presumed to be acquainted with the article in which they deal. If this be so, then the case of *Chandelor* v. *Lopus* must be abandoned, for undoubtedly, as the law is now held, the jeweller would have been liable on the implied warranty. And the same may be said of *Seixas* v. *Wood*, 2 *Caines' Rep.* 48. *Swett* v. *Coligate*, 20 *John. Rep.* 196, which are in opposition to the law of *England, Massachusetts* and *Maryland*, as has been shown by the cases to which I have referred. In *Sexias* v *Wood* the court do not advert to the distinction, that it was a different article, but seem to have grounded their opinion, mainly on the case of *Chandelor* v. *Lopus*. It is to be observed, that *Sexias* v. *Wood* was ruled by a divided court, and it is to be remarked, that Chancellor KENT, who delivered the opinion of the court, has in his Commentaries, since expressed some dissatisfaction with the application of the rule, *Caveat emptor* to the facts of that case. In the 2d. volume of his Commentaries, he says, " There is no doubt of the existence of

(Borrekins *v.* Bevan and Porter.)

the general rule, as laid down in *Seixas* v. *Wood,* and the doubt is whether it was well applied in that case, where there was a description in writing of the article by the vendor, which proved not to be correct, and from which a warranty might have been inferred. The truth is, *Chandelor* v. *Lopus* has been denied to be law, and *Seixas* v. *Wood* has also been questioned, and its authority much shaken, even, by some adjudged cases in the state of *New York.*

As a general rule, I do not mean to impugn the doctrine, that in sales of personal property, the vendor is not answerable for any defects in the quality of the article sold, without an express warranty or fraud. But it must be admitted, that the rule is qualified with many exceptions. Of this description, I take to be *Laing* v. *Fidgeon,* 6 *Taunt.* 108; *Gray* v. *Coxe,* 4 *Barn. & Cresswell,* 108; *Bluett* v. *Osborne,* 1 *Stark.* 377, in addition to those, to which I have particularly adverted. The exigencies of society, the constant change, which is daily taking place in the course of trade, and commercial dealing have caused the courts to relax the rigidity of the ancient rule, and it is remarkable, that the same course has been pursued in regard to the civil law, where the rule is directly the reverse of ours.

It has been said, that the doctrine only applies to executory contracts, but it will be observed, that all cases are actions on the implied warranty, where the contract has been executed, either at the time or afterwards, by payment of the money, and delivery of the property. In *Hastings* v. *Lovering,* 2 *Pick.* 221, there was an attempt made, to put it on the ground of an executory contract, but this is expressly negatived by the court, who ruled the case as one, where the contract was executed.

In all sales, therefore, there is an implied warranty, that the article corresponds in specie with the commodity sold, unless there are some facts and circumstances, existing in the cases, of which the jury under the direction of the court, are to judge, which clearly show, that the purchaser took upon himself the risk of determining not only the quality of the goods, but the kind he purchased, or where he may waive his right. Such for instance as in *Proser* v. *Harris,* 1 *Stark.* 140, where the property was sold by the name of saffron. The purchaser examined it, with great minuteness, kept it six months, and then sold part of it. Although only three fourths of it was saffron, still it was fair for the jury to infer from the *inferior price,* that was given for it, that it was such an article, as the plaintiff intended to purchase.

No such facts exist here. He had, it is true, an opportunity to examine the paints, as every purchaser has, but it does not appear, that he did examine them with great minuteness. He sold no part of them, and it does not appear he gave a full price for the paints. Of this, however, the jury under the direction of the court, are the competent judges.

The court further instruct the jury, that in order to support his

(Borrekins *v.* Bevan and Porter.)

action, it is incumbent on the plaintiff to show, that before bringing suit, he tendered or redelivered the article to the defendants.

If this had been an action to rescind the contract, there would be no doubt, the charge would have been right in this particular. And this was formerly the law on an express warranty, but it has been since ruled, that an action will lie without a return, or offer to return the property. And in this respect, I can perceive no difference between an express and implied warranty. It is said, injustice may be done to the vendor in sustaining a suit, before a return or offer to redeliver the property. It may be so, but the danger exists as well in the case of an express as an implied warranty. We must trust to the good sense and discrimination of the court and jury. This has heretofore been a sufficient safeguard in actions on an express warranty, and I see no reason to doubt, it will prove equally efficacious in actions of the latter description. That there may not be exceptons, I will not say, but I do not think this forms one of them. The measure of damages will of course be the difference between the value of the article delivered and the commodity sold.

GIBSON, C. J.—Where the article has been accepted after inspection or opportunity had, I prefer the rule of the common law to the modern approximations towards that of the civil law; not only because it is a rule of the common law, but because it seems to be more convenient and just; more convenient, because instead of attempting to deal with duties that are too subtile for judicial cognisance, it furnishes a plain test of the vendor's liability in two words, ' warranty or fraud;' and more just, because it pretends not to release the vendee from his bargain where it happens to be a bad one. The subject has been frequently agitated of late, and the superiority of the common law rule vindicated in a way that leaves nothing further to be said. The extent of its authority here was settled, it seemed to me, in *Ricthie* v. *Summers*, 3 *Yeates*, 534. *Kimmel* v. *Lichty*, *Id*. 262. *Willings* v. *Consequa*, 1 *Peters' C. C. R.* 317. *Calhoun* v. *Vechio*, 3 *Wash. C. C. R.* 165. *Jackson* v. *Wetherill*, 7 *Serg. & Rawle*, 482, and *Curcier* v. *Pennock*, 14 *Serg. & Rawle*, 51. which together seem to have placed it on the ground of *Chandelor* v. *Lopus*. From that case down to *Parkinson* v. *Lee*, 2 *East*, 314, it stood unshaken; since when a flood of innovation in England and some of our sister states, has swept away all rule on the subject whatever: From the decisions to which I allude, I am unable to extract a single principle of general application. In some of them an advertisement, a sale note, or the bill of parcels, has been treated as *the contract*, and words that were used palpably to designate the thing sold, or at most to represent its quality or condition, were held, even in the face of an explicit stipulation to the contrary, to constitute an express warranty. Such I take to have been the case of *Sheppard* v. *Kain*, (7 *C. L. R.* 82.) where the representation of a ship as copper-fastened, was held to be a warranty of the fact, though it was an express con-

(Borrekins v. Bevan and Porter.)

dition that the vendor should be answerable for no defect whatever. In *Salmon* v. *Ward*, (12 *C. L. R.* 94), Chief Justice BEST admits a difference between warranty and representation, yet takes for granted that the words, ' this horse is sound,' constitute a warranty, or at least afford evidence of it to be left to a jury. Thus qualified, his admission furnishes but a distinction without a difference, inasmuch as every representation contains an affirmation of the fact represented; nor would the practical value of it be enhanced by allowing the jury to presume an express warranty from any thing less than an express undertaking. In *Wood* v. *Smith*, 4 *Car. & P.* 45. *S. C.* 19. *C. L. R.* 267, the doctrine of constructive warranty was pushed a step still further, a naked affirmation of soundness having been held to constitute an independent, self-existent undertaking, though the vendor had positively refused to warrant the fact, or enter into any stipulation or engagement in relation to it. No one can help seeing the injustice of that. There was, indeed, evidence that the vendor knew of the unsoundness at the time; but however that might have given a remedy against him for the deceit, it surely ought not to have subjected him to the consequences of a warranty. The Supreme Court of *New York*, though professing to adhere to the wholesome doctrine of its own decision in *Seïxas* v. *Wood*, seems nevertheless to have fallen in with the current in declaring a direct affirmation to be an express warranty, or at least evidence of it to go to a jury. In *Chapman* v. *Murch*, 19 *Johns.* 290, it was held that an express warranty need not be in express terms; but that any representation of the state of the thing sold, or direct affirmation of its quality and condition, shewing an intention to warrant, is sufficient. So in *Swett* v. *Colgate*, 20 *Johns.* 196, it is said to be essential that the affirmation appear to have been intended as a warranty, and not as a mere matter of judgment and opinion. But in the *Oneida Manufacturing Society* v. *Lawrence*, 4 *Cowen*, 440, it was held that to be evidence of a warranty, the affirmation or representation must not only be positive and unequivocal, but one on which the vendee relied. In most of the preceding cases, and others not particularly noticed, it seems to have been forgotten that the vendor is answerable for nothing beyond the soundness of the title, and the correspondency of a sample, where one has been used, to the thing sold, unless by force of an *express* warranty. In *Sands* v. *Taylor*, 5 *Johns.* 395, Chief Justice SPENCER very accurately calls the warranty arising in a sale by sample, an implied one; and what is the foundation of the implication? Undoubtedly the affirmation of the seller that the part exhibited fairly represents the quality and condition of the whole. It is difficult, then, to imagine how any other than an implied warranty could arise from the assertion of any other fact. The covenant which arises from the assertion of a fact in a deed is, I believe, always considered an implied one. A naked assertion certainly does not express to the apprehension either of the unlettered or the philologist, an undertaking to make the assertion good; and to imply an express warranty, to

(Borrekins v. Bevan and Porter.)

say nothing of the solecism, from words that do not import it either in a popular or a grammatical sense, is to deal unfairly with the rule which requires it. It is equally unfair to submit a naked assertion as evidence of intention, in order to let a jury draw from it as a conclusion of fact, what the court would not be justified in drawing from it as a conclusion of law. It must be admitted that it is the province of a jury to fix the meaning of the parties to a verbal contract, and that no particular form of words is essential to a warranty; but it seems to me that it ought not to be inferred, even as a conclusion of fact, from terms which convey no such meaning to the popular apprehension. In the exposition of contracts, regard is to be had to the language, habits, and business of those who are the parties, in order to prevent them from being entangled in responsibilities which they never intended to create. There is no man, however unskilled in legal science, who does not know that a warranty means something more than a representation, and who would not, in the concoction of a bargain, make a difference between an assertion and an undertaking to make it good. Nor ought it, I apprehend, to strengthen the case of the buyer, that he had reposed on the judgment and word of the seller as a security, because it would be unfair to permit him to do so without putting the seller on his guard as to the extent of the responsibility he was expected to contract from it. Were he to say explicitly that he meant to purchase on the judgment and at the risk of the seller, no one will doubt that in a vast majority of cases, the terms would be rejected. If, however, they would not, the parties knowing perfectly well what they were about, would enter into a contract of warranty, and no unfair advantage would be gained. But in the usual course of dealing, a chapman praises his commodity with no other view than to enhance its value in the eyes of his customer, who, in turn, depreciates it with a view to cheapen it; yet it never enters into the head of either that the one buys, or the other sells, on any one's judgment but his own. A different course would put an end to every thing like chaffering about the relation of the actual value to the price. It seems to me that the most fruitful source of perplexity in this part of the law, has been an injudicious desire to remedy a real or supposed hardship in particular cases, by straining the evidence to make out a warranty, where none existed in fact or in law. But an inconsistency quite as glaring as the implication of an express warranty, is found in the fact that a sale by sample is left on the old ground, the vendee being taken to buy on his own judgment both as to quality and specific character, and the vendor to undertake no further than that the sample corresponds to the bulk of the article. Why is the undertaking of one who sells by sample, satisfied by delivering an article of the same quality and character? Certainly because the vendee buys on his own judgment and at his own risk as to every thing else; and I am at a loss to understand how the responsibility of the vendor shall be greater or different, where the article itself is exhibited. In other cases where there was in

(Borrekins *v.* Bevan and Porter.)

fact no sale, but an agreement to sell and deliver an article of a par-
ticular quality by a day certain, the executory contract of the party
seems to have been confounded with a present contract of warranty.
Questions, too, have been determined on the ground of warranty that
manifestly turned on that of deceit; as in the case of a sale by a ma-
nufacturer who is bound to know the quality of his wares and disclose
it. These and other loose and inconsistent notions, would furnish a
reason, if one were wanting, why we should not attempt to follow
the modern decisions of other courts, in preference to our own. Though
the distinction between quality and essential character is a novelty,
I certainly prefer it to the want of all rule whatever observable in
the modern cases; yet it seems to have little foundation in reason,
and little to recommend it on the score of certainty and convenience
in practice. It is difficult to comprehend why the vendee shall be
taken to have bought on his own judgment as to quality and not as to
essence; nor will it be easy to say how far a change may have been
produced by adulteration, so as to authorise a jury to determine that
the one denomination of the article has ended, and another begun.
The object of the common law rule is to encourage trade, by pre-
venting actions against all in turn through whose hands the article
has passed in a course of dealing; but this object must be defeated
by the rule now established, wherever the defect is in the essential
character of the thing. I am therefore for adhering to the rule in
*Chandelor* v. *Lopus.*

KENNEDY, J. concurred with the Chief Justice.

Judgment reversed, and a *venire de novo* are ordered.